IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DEXTER SISTRUNK, *individually and on behalf* §
*of a class of similarly situated individuals,* §
§
Plaintiff, §
§
v. §                          5:14-CV-628-RP
§
TITLEMAX, INC., et al., §
§
Defendants. §

## ORDER

Before the Court in the above-styled cause are Defendants' objections to the Magistrate

Judge's Report and Recommendation ("R&R"), filed May 30, 2017, recommending that Plaintiff's

motion for summary judgment be granted in part. (Mot. Summ. J., Dkt. 254; R&R, Dkt. 288;

Objections, Dkt. 294). Having undertaken a *de novo* review of the objected-to portions of the R&R,

*see* 28 U.S.C. § 636(b)(1)(C), the Court issues the following order.

## BACKGROUND

The Court incorporates by reference the factual and procedural background laid out in the

Magistrate Judge's R&R. (*See* R&R, Dkt. 288).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure

only "if the movant shows there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the

outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). The court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## DISCUSSION

Defendants first object to the Magistrate Judge's conclusion that a plaintiff need not show actual damages in order to recover the liquidated damages under the Driver Privacy Protection Act. 18 U.S.C. §§ 2721 *et seq.* They argue, on the contrary, that the absence of proof that Plaintiff or any other class member has suffered actual damages precludes monetary relief. Defendants next take issue with other portions of the R&R, most notably the Magistrate Judge's conclusion that Defendants are vicariously liable for the violations of their employees. The Court will consider each of Defendants' arguments in turn.

### 1.    Actual and Liquidated Damages

The Magistrate Judge disposed of the issue of actual damages briefly in his R&R, referring to his prior ruling, adopted by this Court, that liquidated damages are available under the statute without proof of actual damages. (Dkt. 213). Defendants argue that the ruling is erroneous because, in their view, a plaintiff must demonstrate actual damages in order to recover liquidated damages

under the statute.[1] Because Plaintiff has disclaimed reliance on actual damages, Defendants contend, his request for monetary relief should be denied.

Defendants correctly point out that courts have split on the question whether a plaintiff must demonstrate actual damages in order to recover liquidated damages under the DPPA. District courts have variously held that actual damages are an independent prerequisite to monetary recovery or an unnecessary showing. *Compare Potocnik v. Carlson*, No. 13-CV-2093 (PJS/HB), 2016 WL 3919950, at *10–11 (D. Minn. July 15, 2016) (requiring actual damages), *with Pichler v. UNITE*, 228 F.R.D. 230, 247 (E.D. Pa. 2005) (requiring no actual damages). The circuit courts that have addressed this precise question have unanimously concluded that a court may award statutory damages without a showing of actual damages. *Pichler v. UNITE*, 542 F.3d 380 (3d Cir. 2008); *Kehoe v. Fid. Fed. Bank & Trust*, 421 F.3d 1209 (11th Cir. 2005). The Seventh Circuit, on the other hand, has issued an opinion construing identical text in a different statute as requiring proof of actual damages before an award of liquidated damages is appropriate. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012). The court's opinion in *Sterk* distinguished *Pichler* and *Kehoe* on the basis that the relevant statutes were aimed at different types of harms,[2] but it is not unfair to say that the court appeared to be skeptical about whether *Pichler* and *Kehoe* were correctly decided. *Id.* at 539.

---

[1] Defendants contend that "[i]t is undisputed that *no* plaintiff has suffered *any* actual harm in this case," and occasionally refer to a lack of harm or injury. (Defs.' Objs., Dkt. 294, at 2). The Court construes these assertions as referring exclusively to the issue of damages. Defendants do not appear to dispute that Plaintiff has suffered an injury that is sufficient to support his standing.

[2] The idea that the nature of harm addressed by a statute may change a plaintiff's burden in pleading or proof is not novel. The Supreme Court held in *Spokeo v. Robins*, for example, that the showing required of a plaintiff to establish standing might vary depending on the nature of the interest a statute protects. 136 S.Ct. 1540, 1550 (2016) (noting that allegation of a bare statutory violation may not always support standing, but could do so where the statutory violation involves a "real risk of harm").

The above opinions largely center on the Supreme Court's decision in *Doe v. Chao*, and "the sum of several legal principles" in contract and tort law. *See Kehoe*, 421 F.3d at 1212. Defendants base their arguments on these same sources and the Court now turns to consider them.

## A.    *Doe v. Chao*

Defendants assert that the Supreme Court's opinion in *Doe v. Chao*, 540 U.S. 614 (2004), compels a finding that the availability of liquidated damages is contingent upon a showing of actual damages. This Court disagrees.

*Doe* concerned the remedial provisions of the Privacy Act of 1974, 5 U.S.C. § 552a. The question to be decided in that case was, as here, whether the statute permitted a plaintiff to recover statutory damages without proof of actual damages. Relying heavily on the statute's text, the Court concluded that it did not. The relevant provision, which differs substantially from the one at issue here, provided that an aggrieved plaintiff could recover "actual damages sustained by the individual . . . but in no case shall a person entitled to recovery receive less than the sum of $1,000." 5 U.S.C. § 553a(4)(A). Considering the language "person entitled to recovery," which it described as a "critical limiting phrase," *id.* at 627, the Court found that "the simplest reading of that phrase looks back to the immediately preceding provision for recovering actual damages." It followed that a "person entitled to recovery," and thus entitled to statutory damages, was an individual who had sustained actual damages. *Id.* at 622–23.

Beyond this textual analysis, the Court supported its holding by reference to "the traditional understanding that tort recovery requires not only wrongful act plus causation reaching to the plaintiff, but proof of some harm for which damages can reasonably be assessed." *Id.* at 621. However, the Court acknowledged a potential counterargument that claimants at common law have been able to recover presumed damages without proof of any particular harm. *Id.* (citing 3 Restatement (First) of Torts § 621, Comment *a* (1938) ("General damages are a form of

compensatory damages. They are imposed for the purpose of compensating the plaintiff for the harm which the defamatory publication is proved, or, in the absence of proof, is assumed to have caused to his reputation. It is not necessary for the plaintiff to prove any specific harm to his reputation or any other loss caused thereby.")). It dismissed this argument not by holding that general damages are per se unavailable for statutory causes of action sounding in tort, but rather by noting that such damages appeared to have been considered by Congress and ultimately rejected, thus weighing against finding that the statute nonetheless authorized them. *See id.* at 622 ("Congress left the question of general damages, that is, for another day.").

The Court's decision was thus primarily based upon textual analysis informed by legislative history, rather than upon general principles of tort law. As such, it is advisable to exercise caution in extending the reach of *Doe* to statutes, like the present one, with substantially different text and their own legislative histories. Indeed, the Court found a provision of the Tax Reform Act "too far different from the language of the Privacy Act to serve as any sound basis for analogy" because it "does not include the critical limiting phrase 'entitled to recovery.'" *Id.* at 626.[3] And the DPPA provision this Court must construe differs to an even greater extent from the text of the Privacy Act. Even when presented with statutes containing the "critical limiting phrase" along with clear legislative intent to provide what it described as "true liquidated damages remedies," the Court distinguished these statutes on the basis that they, like the one at issue here, were passed "well after the Privacy Act." *See id.* at 626–27 ("Those of us who look to legislative history have been wary about expecting to find reliable interpretive help outside the record of the statute being construed, and we have said repeatedly that subsequent legislative history will rarely override a reasonable

---

[3] The relevant provision of the Tax Reform Act reads that, where liability under the statute is established, "the United States shall be liable to the person in an amount equal to the sum of—(A) actual damages sustained by the person but in no case shall a person be entitled to receive less than the sum of $1,000." 26 U.S.C. § 6110(j)(2).

interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.") (internal quotations omitted).

Doe thus clearly explains why it does not control the outcome of this case. The text of the later-enacted DPPA's remedial provision differs greatly from that of the Privacy Act, and it does not contain the limiting language the Court deemed "critical." *See id.* at 626. This Court thus cannot agree with Defendants that *Doe* compels a finding that a showing of actual damages is necessary in order to recover liquidated damages under the DPPA.

This view of the limited reach of *Doe* is shared by most other courts that have considered its impact on the DPPA. One district court, for example, found that the distinctions between the DPPA and the Privacy Act "explain why *Doe's* holding [could not] control [its] decision in [that] case." *Pichler v. UNITE*, 228 F.R.D. 230, 244 (E.D. Pa. 2005). Reviewing this decision, the Third Circuit recognized these distinctions and held that the lessons to be gained from *Doe* actually *supported* a conclusion that no showing of actual damages was necessary under the DPPA. *Pichler*, 542 F.3d at 298. The Eleventh Circuit, in finding liquidated damages available without proof of actual damages, likewise concluded that *Doe* was not controlling. *Kehoe*, 421 F.3d at 1214. And, as the Third Circuit would do in *Pichler*, the court in *Kehoe* held that *Doe*'s dicta supported its finding. *Id.* Even the court that provides Defendants with their sole authority that has not been overturned or abrogated placed little emphasis on *Doe*. *See Potocnik*, 2016 WL 3919950, at *11.

Having determined that *Doe* neither compels nor prevents a finding that actual damages must be demonstrated under the DPPA, the Court next considers Defendants' textual argument.

## B.    DDPA's Text

Defendants contend that interpreting the statute to allow liquidated damages without proof of actual damages would rework the statute's text in a variety of ways. The Court considers each of their arguments.

First, Defendants argue that construing the liquidated damages provision as an alternative unrelated to actual damages inserts an "or" between the first and second clauses of § 2724(b)(1). According to Defendants, the fact that the phrase "but not less than liquidated damages in the amount of $2,500" is set off by a comma after the first clause shows that there is a relationship between the two clauses. This Court does not disagree. Nothing in the statute indicates that a plaintiff might recover both actual and liquidated damages; a plaintiff may recover one "or" the other. Additionally, the two are surely related in that the second clause ensures that any award of actual damages under the first clause will not fall below the amount of $2,500. But it does not necessarily follow from this fact that an award under the second clause is predicated on a showing under the first. Rather, this Court is persuaded by the observation in *Kehoe* that "actual damages and liquidated damages are, by definition, completely different types of damages." 421 F.3d at 1213. It would therefore make little sense for the liquidated damages clause to operate as only a constraint of the amount of actual damages the court may award rather than an alternative to them. This Court agrees with *Kehoe* that Congress's use of a separate category of damages weighs in favor of finding that liquidated damages are available independently of actual damages. *See id.*[4]

This brings the Court to Defendants' next argument: that Congress's use of the term "liquidated damages" suggests an intent to import the term's baggage from the law of contracts. Defendants point out that the term "liquidated damages," in contract law, refers to "a reasonable estimation of actual damages" stipulated in a contract. Damages, Black's Law Dictionary (10th ed. 2014). They additionally argue that liquidated damages are *generally* not awarded where there is either no proof of actual loss or where the amount of liquidated damages is disproportionate to the

---

[4] Certainly, Defendants are not wrong to point out that Congress could have expressed its intent more clearly. But this argument hinders Defendants as much as it helps them. As aptly stated in *Potocnik*, "Congress often says the same thing in different ways." 2016 WL 3919950 at *11. The fact that Congress could have spoken more clearly—or had done so in a different statute—does not control the inquiry.

measure of actual loss. *See, e.g.*, *Thanksgiving Tower Partners v. Anros Thanksgiving Partners*, 64 F.3d 227, 232 (5th Cir. 1995) ("[I]f the liquidated damages are disproportionate to the actual damages, the clause will not be enforced and recovery will be limited to the actual damages proven."). Defendants infer from this that Congress intended for liquidated damages to be available only upon a showing of actual damages.

The Court reaches a different conclusion for several reasons. Most critically, a claim under the DPPA sounds in tort, not in contract. A refusal to enforce a liquidated damages provision of a contract where it is disproportionate to actual damages is justified by reference to the exclusively compensatory nature of contract damages and the unwillingness of courts to impose a pure penalty on non-performance or to uphold a provision that "seeks to coerce performance of the underlying agreement by penalizing non-performance and making a breach prohibitively and unreasonably costly." Williston on Contracts § 65:1 (4th ed.). And in a similar vein, punitive damages are categorically unavailable for breach of contract absent an independent tort. *See Watson v. Johnson Mobile Homes*, 284 F.3d 568, 571 (5th Cir. 2002). But the concerns of avoiding penalties and coercion have little weight in the realm of tort law in general and statutory torts in particular. Indeed, it is both rational and likely that Congress sought to coerce compliance with the DPPA by imposing a penalty on violations. *See Margan v. Niles*, 250 F. Supp. 2d 63, 75 (N.D.N.Y. 2003) (noting deterrent goal of DPPA).

Second, Defendants' cherry-picked quotes from Williston overstate the clarity of the term "liquidated damages" even within the context of contract law. The very section they cite provides that:

> [I]n this context, loss is to be distinguished from damages. While it is generally held that an otherwise enforceable liquidated damages clause is not enforceable when there is no actual loss, it is not necessary to prove any particular amount of actual damages in order to recover liquidated damages, and it has been said that liquidated damages can be recovered upon proof of breach, without establishing the exact amount of actual damage, or indeed without proof of any damage.

Williston on Contracts § 65.33. Thus, even if the Court were satisfied that Congress intended to adopt the meaning of "liquidated damages" from contract law, this would not necessarily answer the question whether proof of actual damages is necessary.

Finally, any association between the statute's use of the term "liquidated damages" and contract law is further undermined by a widespread tendency of courts to use the term as a synonym for statutory damages. *See, e.g.*, *Montelongo v. Meese*, 803 F.2d 1331, 1350 (5th Cir. 1986) (upholding award of $500 in "liquidated damages" and holding that actual damages were not the sole measure of relief because the purpose of the remedy was to deter violations);[5] *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1345–46 (5th Cir. 1985) (describing statutory alternative to actual damages as "liquidated damages," and noting punitive nature); *DeLee v. City of Plymouth*, 773 F.3d 172, 173 n.1 (7th Cir. 2014) (using "statutory damages" and "liquidated damages" interchangeably); *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 205–06 (4th Cir. 2009) (providing DPPA's liquidated damages provision as an example of statute that enables recovery of statutory damages without showing of actual damages); *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004) (using "liquidated damages" and "statutory damages" interchangeably); *Desilets v. Wal-Mart Stores, Inc.*, 171 F.3d 711, 713 (1st Cir. 1999) (referring to statutory damages allowed under 18 U.S.C. § 2520 as "liquidated damages"); *Smoot v. United Transp. Union*, 246 F.3d 633, 646 (6th Cir. 2001) (same); *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 434 (Tex. 2005) ("The Fifth Circuit next asks whether a purchaser must prove actual harm or injury to recover *statutory damages* . . . . [T]o conclude that actual damages are a predicate to recovery under this statute would belie our conclusion that the *liquidated damages* provision is, in fact, punitive rather than compensatory.") (emphasis added); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990) ("Although the statute is

---

[5] The Fifth Circuit in *Montelongo* upheld the award of "liquidated damages" despite the fact that, as the dissent pointed out, "the record reveal[ed] that many of the plaintiffs suffered no actual damages from the defendants' conduct." 803 F.2d at 1357 (Jones, J., dissenting).

'remedial,' the *liquidated damages* provision permits an award *without a showing of actual injury.*")
(emphasis added); *Forkes v. Busse*, 510 F. Supp. 122, 122 (E.D. Wis. 1981) ("Finding no actual
damages, I awarded [the plaintiff] $2100 in statutorily liquidated damages and $750 in attorney's
fees.").

    If any of these courts may be accused of carelessness in their language, they may find solace
in the fact that the Supreme Court has indulged in this usage as well. The Court in *Doe* used the term
"true liquidated damages" to refer to recovery without showing actual damages. 540 U.S. at 626
("He contends that legislative history of these subsequent enactments shows that Congress
sometimes used language similar to 5 U.S.C. § 552a(g)(4) with the object of authorizing *true liquidated
damages.*") (emphasis added); *see also Maracich v. Spears*, 133 S. Ct. 2191, 2222 (2013) (Ginsburg, J.,
dissenting) (referring to liquidated damages under DPPA as "statutory damages"). And indeed, in
light of this usage along with the Court's illustration of a statute that would effectuate a "true
liquidated damages" remedy,[6] a legislator reading *Doe* and wishing to authorize the recovery of
statutory damages without requiring proof of actual damages might fashion a statute precisely as it is
written in the DPPA. *See* 18 U.S.C. § 2724.

    This Court thus concludes that the text of the DPPA weighs in favor of finding that actual
damages need not be shown in order to recover liquidated damages.

### C.    General Principles of Tort Law

    Defendants next argue that "[a] general principle of tort law is that damages are not awarded
to one who has suffered no harm." (Defs.' Objs., Dkt. 294, at 9). The suggestion is that, because a
claim under the DPPA sounds in tort, it follows that actual damages must be shown in order for a
plaintiff to have any recovery.

---

[6] The Court stated that "Congress could have accomplished [the object of providing liquidated
damages without proof of actual damages] by providing that the Government would be liable to the
individual for actual damages 'but in no case . . . less than the sum of $1,000' plus fees and costs."
*Doe*, 540 U.S. at 623.

The argument is unpersuasive, at least in this context, for two primary reasons. First, as the Supreme Court observed in *Doe*, exceptions to this general rule exist even at common law. 540 U.S. at 621. Second, even if application of the rule were universal in tort law, it would still not be dispositive. Congress may legislate against the backdrop of the common law, but it is not constrained by it. As Defendants recognize, "Congress may write statutes that depart from traditional notions of tort liability." (Defs.' Objs., Dkt. 294, at 11). And indeed, Congress has done so repeatedly in the consumer protection context. *See, e.g.*, Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(3)(B); Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(2); Fair Credit Reporting Act, 15 U.S.C. § 1681n(a)(1)(A); Truth in Lending Act, 15 U.S.C. § 1640(a)(2)(A); 18 U.S.C. § 2520(c).

General principles of tort law, being general, apply equally to these other statutory tort claims that are generally agreed to authorize recovery of statutory damages without proof of actual damages. The determination whether Congress intended to do so here must be made on other grounds.

### D.      Contrary Authority

The Court next considers the cases that have found that actual damages must be established in order for liquidated damages to be available under the DPPA.

In *Potocnik v. Carlson*, one district court held that the DPPA requires plaintiffs to prove actual damages in order to recover liquidated damages. It based its decision, first, on the structure of § 2724(b)(1). The court found that the statute's placing actual and liquidated damages in a single subsection suggests "that the liquidated-damages clause is not a standalone remedy, but is instead closely connected to, and dependent on, the actual-damages clause." 2016 WL 3919950, at *11. Placing them together, the court believed, indicated that there was no freestanding authority to grant liquidated damages. This Court finds a simpler explanation—that the statute divides the remedies by

type: legal, equitable, and costs. A similar structure can be found in other statutes authorizing statutory damages. *See, e.g.*, 47 U.S.C. § 227(b)(3) (dividing legal and equitable remedies, including both actual and statutory damages in a single subsection).

The second primary basis for the court's holding in *Potocnik* was furnished by the meaning of "liquidated damages" in contract law and the general rule in tort that a plaintiff must prove actual damages. The analysis above explains why this Court finds *Potocnik's* reliance on these principles to be unwarranted.

Another district court relied on these same principles in *Schmidt v. Multimedia Holdings Corp.*, 361 F. Supp. 2d 1346, 1354–56 (M.D. Fla. 2004).[7] This Court need not reiterate its disagreement with that reasoning, but *Schmidt* made one further observation that warrants discussion. The court there noted that improperly obtained information might never be used at all, and that "no legitimate interest would appear to justify a minimum $2,500 recovery for the DPPA's most abstractly defined injury—obtainment—for which the DPPA otherwise provides the incentive (attorneys' fees) and the relief (equitable injunction) for full redress." *Id.* at 1355–56.

This Court finds this reasoning unpersuasive in several respects. First, though liability under the DPPA may attach even if unlawfully obtained information is never used, *Schmidt* overlooks that the statute forbids acquiring personal information only if it is acquired for an improper purpose. 18 U.S.C. § 2722. Thus, a plaintiff must establish that the defendant procured the information with an eye toward its eventual unlawful use, even if the defendant never reaches that point. It is not unprecedented for Congress to provide a civil remedy against attempted, though unsuccessful, wrongful conduct. *See, e.g.*, Anti-Kickback Act, 41 U.S.C. §§ 8702, 8706; Sherman Act, 15 U.S.C. §§ 2, 15. And in any case, there is evidence suggesting the information in this case was used. (*See* R&R, Dkt. 288, at 10 (noting returned solicitation letters)). Second, the statement that "no legitimate

---

[7] The Eleventh Circuit expressly abrogated *Schmidt*'s holding on actual damages in its decision in *Kehoe*. 421 F.3d at 1212 n.2.

interest" is served by the statutory damages gives short shrift to the individual's privacy interest and Congress's clear intent to discourage and deter improper access to personal information.

This bears on the third point. The *Schmidt* court incorrectly assumes that equitable relief can adequately vindicate those interests. For one thing, general principles of equity call into question whether a prospective injunction requiring the defendant to "follow the law" would be appropriate without showing a likelihood of future violations. *See Does 1–7 v. Round Rock Ind. Sch. Dist.*, 540 F. Supp. 2d 735, 745 (W.D. Tex. 2007) ("In the absence of some allegedly imminent violation of the law, . . . an injunction [to follow the law] is inappropriate . . . .") (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Additionally, an injunction merely requiring the wrongdoer to dispose of the unlawfully obtained information neither undoes the invasion of privacy nor provides any deterrence.

This case provides an apt illustration. Defendants have long since completed their solicitation of the class members, enabled by their undisputedly unlawful acquisition of information. It is not unreasonable to assume that their unlawful actions generated new profits—that was, after all, the point. Now, several years later, Defendants have likely extracted all the value they can from the information and no longer require it. An injunction requiring them to dispose of the class's information—if they have not already done so—allows them to dump now-useless data while retaining ill-gotten profits and offering nothing at all to the plaintiff whose privacy was violated.

Nor does the Court believe that the availability of attorney's fees and costs changes the sufficiency of injunctive relief. The point of providing statutory damages, even in the absence of actual damages, is to encourage private attorneys general to police compliance with a statutory obligation. *Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 437 (5th Cir. 2000) ("The caselaw confirms that statutory damages may be imposed as a means to encourage private attorneys general to police . . . compliance even where no actual damages exist."). But where only the attorney stands to recover anything of value from an action, as under the remedial scheme suggested by *Schmidt*, the

statute would have the perverse effect of encouraging the lawyer-driven litigation that Congress frowns upon. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that one of Congress's goals in enacting Private Securities Litigation Reform Act was to curb lawyer-driven litigation). An injured plaintiff, meanwhile, would be indifferent to bringing suit. Additionally, given the difficulty of detecting a violation of the DPPA and measuring resulting damages, a wrongdoer might reasonably believe the benefits of violating the law outweigh the likely costs where his liability is capped at the costs and fees of a hypothetical plaintiff that, somehow, learns of his deeds.[8] Such a regime would poorly serve Congress's intent to deter violations.

The Court thus remains unpersuaded that *Potocnik* and *Schmidt*, rather than *Kehoe* and *Pichler*, were correctly decided.

### E. Conclusion Regarding Actual Damages

The Court here is faced with a body of law in which Congress has said the same thing in different ways, *see Potocnik*, 2016 WL 3919950 at *11, and, it seems, different things in the same way. *See Sterk*, 672 F.3d at 538–39 (interpreting remedial language identical to DPPA to require proof of actual damages). Congress has spoken here against a backdrop of tort law that generally, though not always, requires proof of actual damages, using language from a completely separate area of law that has meaning both courts and legislatures often ignore. In light of the text, structure, and purpose of the DPPA, however, the Court is persuaded that *Kehoe* and *Pichler* were correctly decided and that a plaintiff need not establish actual damages in order to receive liquidated damages. In the Court's view, this holding better serves congressional intent and effectuates the remedial and deterrent purposes of the statute.

---

[8] The Court also notes the principle that a harsher deterrent is warranted where violations are difficult to detect is well supported in the law. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996).

One issue regarding damages remains: whether the Court retains discretion under the statute to refuse to award damages. The Court will address this point following its discussion of liability.[9]

## 2. Vicarious Liability

Defendants make two arguments about vicarious liability. First, they assert that, under the Fifth Circuit's *Vavra* line of cases, they can only be liable for the acts of individuals with sufficient authority that their knowledge could be imputed to the corporations. *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc. (Vavra I)*, 727 F.3d 343 (5th Cir. 2013); *United States ex rel. Vavra v. Kellogg Brown & Root, Inc. (Vavra II)*, 848 F.3d 366 (5th Cir. 2017). Second, while not disputing that their employees improperly obtained information, Defendants assert that the employees did not act within the scope of their employment in doing so. For the reasons that follow, the Court finds both arguments unavailing.

### A. *Vavra*

The Fifth Circuit twice examined the availability of vicarious liability under the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8710 *et seq.*, in its *Vavra* line of cases. The AKA prohibits persons from providing, attempting to provide, soliciting, accepting, or attempting to accept a kickback, or including the amount of a kickback in a contract price when contracting with the federal government. 41 U.S.C. § 8702. The government may bring a civil action to recover civil penalties both from (1) persons who knowingly engaged in conduct prohibited by the AKA, § 8706(a)(1), and (2) persons whose employees, subcontractors, or subcontractor employees committed a violation, § 8706(a)(2). From the first group, the government can recover double the amount of the kickback and an additional penalty of up to $10,000 for each violation. *Id.*

---

[9] Defendants mention in passing that a large liquidated damages award would raise due process concerns. (Defs.' Objs., Dkt. 94, at 12). They did not raise the issue before the Magistrate Judge and do not elaborate on it in their briefing here. This Court declines to construct an argument *sua sponte* to discuss.

§ 8706(a)(1). From the second group, the government may only recover the amount of the kickback. *Id.* § 8706(a)(2).

In *Vavra I*, the Fifth Circuit reversed the district court's finding that vicarious liability was not available under § 8706(a)(1). The district court had reasoned that, because § 8706(a)(2) explicitly provided for the liability of persons whose employees committed violations, reading vicarious liability into section § 8706(a)(1) would deprive the two provisions of distinct meaning. *Vavra I*, 727 F.3d at 348. The Fifth Circuit found that, although the district court's reading gave effect to both provisions, it insufficiently accounted for the fact that both subsections allow the government to recover from a "person." *Id.* Since the AKA defines "person" to include corporations and other business organizations, and because courts assume that Congress intends to incorporate rules of vicarious liability when it creates causes of action sounding in tort, the court concluded that vicarious liability was available under § 8706(a)(1) where an agent violates the AKA while acting with apparent authority. *Id.* at 348–49, 352. This holding did not render either subsection superfluous, the court reasoned, since § 8706(1) requires proof of a "knowing" violation while § 8706(2) does not. *Id.* at 348. The court declined to discuss the knowing misconduct requirement at that time. *Id.* at 348–49.

In *Vavra II*, the court considered whether showing that an agent acted with apparent authority was sufficient to establish a knowing violation under § 8706(1), concluding that it was not. Rather, the court held, a corporation is liable "only for the knowing violations of those employees whose authority, responsibility, or managerial role within the corporation is such that their knowledge is imputable to the corporation." *Vavra II*, 848 F.3d at 375 (quoting *Vavra I*, 737 F.3d at 355) (Jolly, J., concurring)). Applying an apparent-authority-only test to both subsections would "frustrate[] the[] deliberate distinctions" between them, the court reasoned, and would "eliminate any difference between the Government's burdens" under the two provisions. *Id.* at 373. This was

so because the nature kickbacks is such that "an employee who receives a kickback will almost always have apparent authority because 'it would be nonsensical to give a kickback to an employee who lacked apparent authority to accomplish its object.'" *Id.* (quoting *Vavra I*, 737 F.3d at 356)). Additionally, although § 8706(2) had no explicit knowledge requirement, "we can assume a person who is being bribed always knows he is being bribed" and thus "the knowledge requirement would not add to [§ 8705(a)(1)] if it applied to employees rather than to the corporation itself." *Id.* (quoting *Vavra I*, 737 F.3d at 354 n.1)).

It should be noted that the holding of *Vavra II* represents a departure from the traditional rule of *respondeat superior* in tort law which, as Judge Jolly noted in *Vavra I*, holds employers strictly liable for the torts of its employees committed within the scope of their employment. *Vavra I*, 727 F.3d at 355–56 (citing Restatement (Second) of Agency § 219); *Commodity Futures Trading Comm'n v. Schafer*, 1997 WL 33547409, at *6–7 (S.D. Tex. Dec. 23, 1997) (citing *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 902 F.2d 963, 966 (7th Cir. 1986)). In other words, it is traditionally not necessary to impute a particular *mens rea* to the corporation with respect to the torts of its employees in order for it to be vicariously liable. The peculiarities of kickbacks in general and the text of the AKA in particular explain why a departure was warranted in the AKA context.

These peculiarities are not present here, however, and this Court is not convinced that the *Vavra* cases answer whether the term "knowingly" applies to the corporation or the employee in under the DPPA. First, the DPPA does not have a separate provision allowing suit against the employer of a person who violates the DPPA. Instead, it has a single provision allowing suit against a person who "knowingly obtains, discloses or uses personal information" for an improper purpose. 18 U.S.C. §2724(a). Second, there is no basis to assume that all violations of the DPPA will be knowing in the same way it could be assumed that a person being bribed would be aware of the bribe. The DPPA thus does not present a situation in which the application of the traditional rules

would lead to anomalous textual or practical results, as would have been the case if the same had been done with the AKA.

Lacking the justifications provided in the *Vavra* cases, this Court cannot conclude that a similar departure from the traditional rules of *respondeat superior* is warranted in this case. Instead, the Court construes the requirement of a "knowing" violation is simply an element of the tort, not a limitation on vicarious liability. Accordingly, an employer is directly liable for the violations for which it has the requisite knowledge and vicariously liable for the violations its employees committed knowingly and within the scope of their employment. This does no violence to the text of the statute and better effectuates the congressional purpose of deterring violations. Indeed, the Court notes that the AKA still allowed a remedy against a corporation under a rule of "traditional strict liability," *Vavra I*, 727 F.3d at 355–56, though the remedy was limited to the value of the kickback. Only if the government wished to recover the broader remedy of double the kickback value and a further statutory penalty would it have to show imputable knowledge. *See id.* In this case, lacking a separate traditional liability provision, Defendants' reading would dramatically curtail the enforceability of all the remedial provisions of the DPPA.[10] The Court does not believe this to be Congress's intent.

Having determined that traditional rules of vicarious liability apply, and that Defendants are therefore liable for the torts of their employees committed within the scope of their employment or with apparent authority, the Court next examines whether the evidence established that Defendants employees violated the DPPA within the scope of their employment, as Plaintiff contends.

---

[10] The statute defines liability in a separate provision. Thus, the availability of each remedy flowing from that liability—actual and statutory damages, punitive damages, equitable relief, attorneys' fees and costs—would be limited by a requirement of imputable knowledge. *See* 18 U.S.C. § 2724.

### B.     Scope of Employment

The Report and Recommendation discusses a variety of evidence demonstrating that employees, district managers, general managers, and regional managers of Titlemax were engaged in, aware of, and encouraging violations of the DPPA for the purpose of soliciting customers. (R&R, Dkt. 288, at 8–11). Noting that Defendants offered little to dispute that evidence, the Magistrate Judge concluded that there was no genuine issue for trial regarding whether Defendants could be held vicariously liable for these violations. Defendants have offered the same arguments here, and this Court likewise finds them unconvincing.

The Restatement (Second) of Agency lists several factors relevant to determining whether conduct is within the scope of employment, including: (1) whether it is of the kind the employee is employed to perform; (2) whether it occurs substantially within the authorized time and space limits; and (c) whether it is actuated, at least in part, by a purpose to serve the employer. Restatement (Second) of Agency § 228 (1976). Under Texas law, the relevant factors concern whether the employees' acts were (1) within the general authority given to him; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed. *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995).

Putting aside Defendants' arguments concerning their level of knowledge of the violations, which are irrelevant to this inquiry for the reasons stated above, Defendants suggest that the violations were committed by rogue employees acting for their own benefit. The evidence simply does not support this assertion under the relevant factors. As noted by the Magistrate Judge, the evidence shows to the contrary that the employees engaged in violations of the DPPA for the purpose of soliciting customers for Defendants' businesses.

The evidence advanced by Defendants to rebut this misses the mark. For example, Defendants cite excerpts from the deposition of employee Radamez Casillas wherein he testifies that

he used his own credit card to create the account he used to search DMV records. But he does not state that he did so for personal purposes, out of devious curiosity, or on his own time. Rather, he confirms repeatedly that he did so in order to search for more business for Defendants or to accomplish other work-related objectives. (*See* Casillas Depo. Dkt. 150-49, at 16:22–25 ("It was just a website that had . . . customers that already had title loans for various lienholders in the area, and we could send buyout letters to try and buy the loans out."); *id.* at 52:1-4 ("PublicData.com was a website that Lewis at the time explained to me that . . . we can use to check titles to make sure they don't have liens before we do a loan on a customer."))[11] The remaining evidence cited likewise tends to show that some employees paid for their own data-searching accounts, were not reimbursed by Defendants, may have received certain lists from other employees rather than generating them independently, and were eventually asked to stop violating the DPPA. None of this evidence rebuts in the slightest way that the employees acted within the scope of their employment. On the contrary, it establishes at most that Defendants' employees had to pay out-of-pocket for the privilege of advancing Defendants' interests.

In light of the significant evidence put forward by Plaintiff to demonstrate that DPPA violations at issue in this case were committed within the scope of the individuals' employment , and the lack of probative contrary evidence offered by Defendants, this Court concurs with the Magistrate Judge's conclusion that there is no fact dispute concerning Defendants' vicarious liability.

## 3.    Knowledge of Illegality

Defendants next argue that an individual is not liable under the DPPA if he was not aware that his purpose for accessing information is not permitted under the statute. Accordingly, Defendants contend, they have no liability under the DPPA because their employees did not know

---

[11] This latter purpose of checking to ensure a customer had no liens before authorizing a loan likely falls within the exception under the DPPA to verify information submitted by a customer in the normal course of business. *See* 18 U.S.C. § 2721. But it still demonstrates that Casillas accessed the records for work-related purposes.

that their usage was prohibited by the DPPA. Defendants base their argument on the statute's text: "a person who *knowingly* obtains . . . personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable . . . ." 18 U.S.C. § 2724(a) (emphasis added). The term "knowing," they argue, applies to all elements of the statute, including that the DPPA prohibits access for a given purpose.

The Court does not share this reading of the statute, which simply cannot be squared with the statute's plain language. The statute makes punitive damages available only "upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724. The simple fact that Congress made punitive damages available only "upon proof" that an individual willfully disregarded the law or was reckless as to the possibility that his conduct might violate the law demonstrates that it expected the usual case to have no proof of such a willful violation. If knowledge that a purpose is forbidden is a prerequisite to liability under the DPPA, then there would be no situation in which punitive damages are not warranted. Defendants resist this straightforward analysis by insisting that the terms "willful," "reckless," and "knowing" each have distinct meanings. True enough: "knowing violations are sensibly understood as a more serious subcategory of willful ones." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59 (2007). It would make little sense to make punitive damages available only if the plaintiff establishes *less culpable* conduct than is necessary to create liability in the first instance.

The Court therefore cannot conclude that the DPPA imposes liability only when an individual knows his conduct violates the law. *See Pichler*, 542 F.3d at 396–97; *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537 (1999) (holding defendants could be liable for engaging in "intentional discrimination . . . prohibited under [Title VII]," 42 U.S.C. § 1981a(a)(1), while not knowing the conduct to be prohibited or intending to violate the law). Defendants' evidence that their employees were unaware that their conduct was unlawful is therefore irrelevant and does not shield them from liability.

4.      **Evidentiary Objections**

Defendants raise two primary objections to evidence the Magistrate Judge considered in preparing his Report and Recommendation. First, Defendants object to the use of deposition testimony from separate litigation, which they contend is inadmissible under Federal Rule of Evidence 804(b)(1) because they did not have a similar motive to develop the testimony on cross-examination. However, as this Court has recently held, "a transcript of prior testimony, much like an affidavit or deposition testimony, is permissible summary judgment evidence." *Kalmus v. Zimmermann*, No. 1:15-cv-316-RP, 2016 WL 6462297, at *6 (W.D. Tex. Nov. 1, 2016).

Second, Defendants object that the vehicle owner lists it produced in discovery have not been authenticated. The Court agrees that this objection lacks merit for the reasons stated by the Magistrate Judge and by Plaintiff. First, the vehicle owner list has been previously admitted as evidence of the class of individuals whose information was wrongfully obtained, and Defendant did not object to the admissibility of this evidence at that time. (*See generally* Objs. to R&R on Class Certification, Dkt. 218). The Magistrate Judge had previously informed the parties that, because Defendants had not adequately disclosed to Plaintiff the provenance of the various vehicle owner lists at a Rule 30(b)(6) deposition, he would allow the lists to "speak for themselves" unless Defendants disclosed their source to Plaintiff. (*See* Tr., Dkt. 177). Defendants do not contend that they later supplemented their disclosures concerning the lists.

Second, under Local Rule 26(d), "[a] party's production of a document in response to written discovery authenticates the document for use against that party in any pretrial proceeding or at trial unless . . . the party objects to the authenticity of the document" within fourteen days of production. Defendants do not dispute that they produced the evidence in response to Plaintiff's discovery request and do not argue that they raised a timely objection to its authenticity. Accordingly, the documents are adequately authenticated pursuant Local Rule 26(d).

It is unnecessary to consider whether Federal Rule of Evidence 901(b)(4) provides an additional avenue to authentication.

## 5.    Remedy

In light of the foregoing analysis, this Court finds that the findings and conclusions contained in the Magistrate Judge's R&R are correct and well supported on the issue of Defendants' liability. It is therefore necessary to consider the matter not discussed in the R&R: an appropriate remedy.

The statute provides that "[t]he court may award" actual, liquidated, and punitive damages, along with attorneys' fees, costs, and injunctive relief. 18 U.S.C. § 2724(b). The parties generally agree the use of the word "may" indicates that a court enjoys some level of discretion in crafting an award. They differ, however, on whether a court has discretion to award no damages at all. Plaintiff, for instance, argues that although a court *may* award actual damages, it *must* award liquidated damages. He is supported in his argument by *Pichler*, which found that a court "may not grant an award 'less than liquidated damages in the amount of $2,500.'" 542 F.3d at 398 (citing 18 U.S.C. § 2724(b)(1)). Defendants, on the other hand, argue that the Court may elect to award no damages. They concede, however, that the court is nonetheless required to award at least $2,500 in liquidated damages if the Court opts to award damages at all. (Defs.' Objs., Dkt. 294, at 6).

The Court finds it unnecessary to resolve this issue because it finds that an award of damages in this case best serves congressional intent to deter violations of the DPPA, and is warranted in light of the clear profiteering motive behind Defendants' repeated violations of the statute. Under either party's reading of the statute, therefore, a minimum award of $2,500 per violation is required. The Court also finds it appropriate to award attorneys' fees and costs.

## CONCLUSION

For the foregoing reasons, the Court hereby **OVERRULES** Defendants' objections and **ORDERS** that the Report and Recommendation of the United States Magistrate Judge is **APPROVED AND ACCEPTED**. (Dkts. 288).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment is hereby **GRANTED**. (Dkt. 254). Defendants are jointly and severally liable to the class in the amount of $12,362,500.00, which represents the minimum damages award of $2,500 per class member. Defendant is additionally liable for attorneys' fees and costs in an amount to be determined in accordance with Local Rules CV-7(j) and CV-54.

**SIGNED** on August 17, 2017.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE